# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOHNSON CONTROLS, INC. | * | CIVIL NO. 6:10-0080 |
| VS. | * | MAGISTRATE JUDGE HILL |
| LYLE GUIDRY, ET AL. | * | BY CONSENT OF THE PARTIES |

## MEMORANDUM RULING

Before the court is the Motion for Preliminary Injunction filed by plaintiff, Johnson Controls, Inc. ("JCI").[1]  [rec. doc. 2].  The defendants, Air Plus, LLC ("Air Plus"), Lyle Guidry ("Guidry") and Anthony Richard ("Richard"), filed Opposition.  [rec. doc. 31].  A hearing on the Motion was held on April 8, 2010 and the Motion was taken under advisement pending Post-Hearing briefing in which the parties were to specifically address the following: (1) what each party contends constitutes, or does not constitute, a JCI trade secret, intellectual property and confidential information; (2) the effect, if any, of the lack of a non-compete agreement with defendant Richard; (3) the remedy sought as to each party, specifically addressing the relief sought against Air Plus, which is not a signatory to any agreement with JCI; (4) why, or why not, monetary damages is not an adequate remedy for the injuries alleged by JCI; (5) the effect, if any, of the lack of a specific and defined geographical limitation in defendant Guidry's non-compete agreement; and (6) the legal effect, if any, of the lack of evidence that either defendant Richard or Guidry directly supervised any JCI employee, who left JCI.  [rec. doc. 42].  The parties have filed their Post-Hearing Briefs.  [rec. docs. 46 and

---

[1] JCI's request for a Temporary Restraining Order has been withdrawn. [*See* rec. doc. 19].

48].  This Ruling follows.

By the instant Motion, JCI seeks a preliminary injunction against each defendant.  More specifically, as set forth in JCI's Post-Hearing Brief,[2] JCI seeks to enjoin Guidry from performing any services for Air Plus with respect to existing or potential JCI customers he served or solicited while a JCI employee and from soliciting JCI employees for employment with Air Plus through September 17, 2010; JCI seeks to enjoin Guidry and Richard from disclosing and otherwise accessing, using or relying upon JCI's confidential information and trade secrets, purportedly its customer list, customer maintenance information and margins through September 17, 2011.  JCI additionally seeks an order requiring Air Plus to disgorge any profits it has made by allegedly improperly using JCI's trade secrets and confidential information. For the following reasons, the motion for preliminary injunction is **denied**.

## FACTUAL BACKGROUND

Both Guidry and Richard were account representatives (salespersons) for JCI.  Richard began his employment with Berg Mechanical in 2001 as a field technician and was thereafter promoted to project manager in 2003.   After JCI bought Berg Mechanical in 2006, through a stock purchase agreement, he became a salesperson.  As a salesperson, he sold service contracts (Plan Service Agreements - PSA's) mainly for HVAC repairs targeting commercial buildings as his customer base.  Guidry began his employment with JCI on November 1, 2007.

---

[2]To the extent that other relief may have been suggested by the original Motion, given this court's specific instructions as to the content of the Post-Hearing briefs, including a discussion of the remedy sought as to each defendant, the court will address only those items set forth in JCI's Post-Hearing brief, which presumably conforms to the evidence JCI believes was presented at the evidentiary hearing.

Prior to his start date, on October 29, 2007, Guidry signed a JCI Employment Agreement (the "Agreement"), which contained confidentiality, employee tampering and non-competition clauses.

The confidentiality clause provides that "for the term of [his] employment and thereafter, as long as the information remains confidential or proprietary," Guidry "shall not disclose to others, copy or use, except as authorized by Johnson Controls, any confidential or proprietary information of Johnson Controls or its subsidiaries and affiliates . . . concerning any aspect of the business of Johnson Controls that [he] may acquire or originate during [his] employment."  The Agreement does not define the term "confidential or proprietary information."

The employee anti-tampering clause provides that during, and for one year after his period of employment, Guidry will not "solicit, induce or recommend that any Johnson Controls employees, whom [he] supervised or about whom [he] received confidential information, seek employment with any company competitive with the Controls Group of Johnson Controls."  The term "Controls Group" is not defined in the Agreement, nor is the term "confidential information".

The non-competition clause provides that for a period of one year following the date of Guidry's termination, he "will not perform services directly or indirectly in or for a business competitive with Johnson Controls, with respect to: 1) existing Johnson Controls customers or potential customers served or solicited by [him] or someone under [his] supervision while [he] was a Johnson Controls employee, and/or 2) potential customers who within the last 9 months

3

of employment received or were about to receive proposals from any employee of Johnson

Controls with whom I had contact."

The Agreement contains no geographical boundaries whatsoever; no specific parishes

(counties) are identified by name, or referenced in any attachments to the Agreement.

Moreover, the Agreement contains no severability clause, but rather contains a clause

mandating that the Agreement "not be modified or terminated in whole or in part, except by an

instrument in writing signed by an officer or other authorized executive of Johnson Controls."

That same date, October 29, 2007, Guidry also signed an Employee Intellectual

Property and Confidentiality Agreement which contains a confidentiality clause which

provides that Guidry "shall not disclose to anyone, other than may be required by [his]

employment or may be authorized in writing by JCI, nor use for the benefit of [him]self or

others, any item of Intellectual Property which is confidential or proprietary to JCI, and that

[he] may acquire or originate during [his] employment and that relates to any aspect of the

business of JCI . . . ."

"Intellectual Property" is defined in the Agreement as "inventions, whether patentable

or unpatentable, and any works or authorship including but not limited to computer programs

. . . which were made or conceived by me, either solely or jointly, during the term of my

employment and relating to the current and reasonably anticipated business of JCI . . . ."  The

Agreement further provides that "[t]he definition of Intellectual Property, as used in this

Agreement, shall also include any data or information however embodied or created

4

irrespective of whether in human or machine readable form, concerning any aspect of the business of JCI."

Richard did not sign a JCI Employment Agreement. Thus, he is not subject the non-competition or employee tampering provisions. However, on June 13, 2006, Richard signed an Employee Intellectual Property and Confidentiality Agreement which contains a confidentiality clause identical to that signed by Guidry.

Both Guidry and Richard resigned from JCI effective September 11, 2009; notice was given by email sent on September 10, 2009 after 5:00 p.m. On September 10, 2009, Richard emailed a document entitled "Lafayette PM Master with renewal dates Rev 04 01 08.xls" to his wife. The document contained a customer list, which, according to Richard, was outdated as more than half of the companies on the list were no longer JCI customers. Richard designated these former customers on the list by highlighting their names on the document.

Richard testified that he emailed the document to his wife to chronicle the downfall of JCI in the event that JCI later questioned his reason for leaving. Richard also emailed another similar document to his wife with a handwritten notation "Canceled document". Both documents list customer preventative maintenance or PSA contract renewal dates.

No evidence was presented to establish that Air Plus performed any work for any of the customers on either list. Moreover, Richard testified that the documents were of no use to him because they did not contain information on the scope of work performed for the customer or the type of equipment the customer had. At the request of JCI, Richard destroyed all copies of

these documents and removed them from his computer.  Prior to their destruction, Richard did not provide a copy of these documents to anyone other than his counsel.

Prior to their departure from JCI, on August 18, 2009, Guidry and Richard filed Articles of Incorporation for Air Plus, LLC, a company owned 50% by each.  Air Plus provides air conditioning service, repair and maintenance, including HVAC work, and, as such, according to Guidry, is a competitor of JCI with respect to mechanical HVAC work. Guidry testified, however, that Air Plus responds to calls; it has no long term contract customers as does JCI.  By September 10, 2009, Air Plus had an email address, and by September 25, 2009, Air Plus had its own letterhead and proposals were being sent to prospective customers, one of which was the Iberia Parish School Board. Air Plus began doing work for customers in mid-November, 2009.

At the time Guidry and Richard resigned, Michele Albarado was employed by JCI as a project coordinator, on the "project side" of the company.  Both Guidry and Richard were on the "service side" of the company and neither supervised her.  Albarado's duties included invoicing customers, accounts payables and accounts receivable.  The day that Guidry and Richard resigned, Albarado testified that, as they were packing their belongings, she was called to Richard's office, at which time they (Richard and Guidry) asked her if she would be interested in working for them; she replied that she would.  Accordingly, Albarado left JCI and went to work for Air Plus about a month and a half later as the office manager; in this capacity she does bookkeeping, invoicing, accounts payable and accounts receivable.  Before she went

to work for Air Plus, Albarado testified that she had contact with both Guidry and Richard with regard to her employment.

Air Plus also currently employs five former JCI technicians - Seth Melancon (who previously did work on behalf of JCI for Quality Assured Plating), Dennis Guidry (who previously did work on behalf of JCI for the Iberia Parish School Board), Gary Odom, Terry Hargrave, and Kevin McRae. With respect to Melancon, Richard testified that he, Melancon, approached Richard telling Richard that if he, Richard, ever left JCI, he, Melancon, would be willing to go to work for him. With respect to the hiring of these technicians, Richard testified that they called him. Thereafter, he prepared an offer letter that he emailed or gave to the potential employee. Guidry testified that Richard handled the employment negotiations and that his sole involvement was putting together a benefit package that Air Plus could offer. In crafting the employee benefit package, Guidry did not rely on information he obtained from JCI, but, rather, he relied on his own resources, including his prior experience as vice president of a commercial construction company and contacts with small insurance brokerage firms.

Prior to their leaving JCI, Richard and Guidry had attended a meeting wherein it was decided that the service rates for the Iberia Parish School Board ("the Board") would be increased. Both were charged with the task of delivering the new rate proposal to Harry Lopez ("Lopez"), the contact person for the Board. After Richard and Guidry resigned from JCI, Lopez asked Air Plus to submit a proposal for services, as he was obtaining prices from multiple contractors. Accordingly, after meeting with Lopez, by letter dated September 25,

2009, a proposal was submitted to the Board by Air Plus.  Lopez testified by affidavit that he had made the decision to seek pricing information from other contractors and to use a vendor other than JCI prior to the September 25, 2009 meeting, and that this decision was not based on the formation of Air Plus, or any statements or actions of Guidry or Richard.

By email dated October 26, 2010, Guidry advised Lopez that Air Plus would be acquiring "key members of your current service providers team" and that it was anticipated that these personnel could start providing services for the Board by November 16, 2009. Following a meeting between Richard, Guidry and Lopez, the labor rates were adjusted as reflected in a proposal dated November 3, 2009.  Lopez accepted this proposal.  Lopez testified by affidavit that neither Guidry nor Richard disclosed JCI pricing or other confidential information to him.  The Board has cancelled its annual contract with JCI, from which JCI would have earned a profit of approximately $210,000.00.

Air Plus also sent proposals to other JCI customers (present or former) including the following: Lafayette General Hospital, Wampold Companies (Bayou Shadows), Quality Assured Plating, Acadia Vermillion Hospital, Abbeville General Hospital, University Medical Center and Roggweiler Tannery. Air Plus also prepared a budget for the Acadia Parish Police Jury to obtain funding prior to acceptance of public bids.  Air Plus has performed HVAC or air conditioning related work for Lafayette General Hospital, Quality Assured Plating, Acadia Vermillion Hospital, and Abbeville General Hospital.

The Acadia Parish Police Jury, Tolson Management Company and Quality Assured Plating, prior JCI PSA contract customers, have cancelled their contracts with JCI.  By affidavit, a representative of Acadia Parish Police Jury testified that the decision to cancel the PSA contract with JCI was not based on the formation or existence of Air Plus and that neither Guidry nor Richard were responsible for the cancellation.  A representative of Tolson Management Company likewise testified by affidavit that the decision to cancel the PSA contract with JCI was not based on the formation or existence of Air Plus; to the contrary, he had not even met with Guidry or Richard prior to making the decision to cancel the contract with JCI.  A representative of  Quality Assured Plating testified by affidavit that neither Guidry nor Richard requested or urged the company to cancel its contract with JCI, nor have either disclosed JCI pricing or other confidential information to him.

## LAW AND ANALYSIS

The grant or denial of a preliminary injunction rests in the discretion of the district court, subject only to the satisfaction of four prerequisites enumerated by the Fifth Circuit for granting such relief.  *Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985); *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  In order to obtain a preliminary injunction, the plaintiff must demonstrate each of the following pre-requisites: 1) a substantial likelihood of success on the merits; 2) a substantial threat that failure to grant the injunction will result in irreparable injury; 3) the threatened injury outweighs any damage that the injunction will cause to the adverse party; and

9

4) the injunction will not have an adverse effect on the public interest. *Women's Med. Ctr. of Northwest Houston v. Bell,* 248 F.3d 411, 419 at fn. 15 (5th Cir. 2001) *citing Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).  The movant must prove all four elements and failure to prove any one of them will result in denial of the request.  *Enterprise Intern., Inc.,* 762 F.2d at 472.  "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir. 1985).

"[A] preliminary injunction is an extraordinary and drastic remedy" which should not issue except upon a clear showing of irreparable injury.  *Enterprise Intern., Inc.,* 762 F.2d at 472; *Lewis v. S.S. Baune,* 534 F.2d 1115, 1121 (5th Cir. 1976).  Irreparable injury is harm that "cannot be undone through monetary damages," that is, harm for which money damages are inadequate or for which money damages are "especially difficult" to compute. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Allied Marketing Group, Inc. v. CDL Marketing, Inc*., 878 F.2d 806, 810 fn. 1 (5th Cir. 1989).  The "central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be compensated by money damages."  *Allied Marketing Group, Inc.,* 878 F.2d at 810 fn. 1.

Thus, there can be no irreparable injury where money damages would adequately compensate a plaintiff.  *DFW Metro Line Services v. Southwestern Bell*, 901 F.2d 1267, 1269

(5th Cir. 1990) (citations omitted).[3]  Simply arguing that a company is losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm. *Millennium Restaurants Group, Incorporated v. City of Dallas*, 181 F. Supp.2d 659, 666 (N.D. Tex. 2001); *Sun Water Systems, Inc. v. Vitasalus, Inc*., 2007 WL 820280, *6 (N.D. Tex. 2007).

JCI invokes this court's diversity jurisdiction. [rec. doc. 1, ¶ 1].  Accordingly, the substantive law of Louisiana applies.  *See Erie R.R. Co., v. Thompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Woodfield v. Bowman*, 193 F.3d 354, 359, n.7 (5th Cir. 1999).

With respect to JCI's claims for preliminary injunctive relief involving Guidry's non-competition clause, JCI fails to satisfy the first element, that is, a substantial likelihood of success on the merits, because the non-competition clause is unenforceable under Louisiana law.  Likewise, with respect to JCI's claims under the Louisiana Uniform Trade Secrets Act ("LUTSA"), on the evidence presented, a preliminary injunction is not warranted.  With respect to the remainder of JCI's claims for preliminary injunctive relief, JCI fails to satisfy the second element, that is, a substantial threat that failure to grant injunctive relief will result in irreparable injury; JCI has not shown that special circumstances in this case would make money damages inadequate should JCI prevail on the merits.

---

[3]The Fifth Circuit has noted that "[o]ften times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable." *Tate v. American Tugs, Inc*., 634 F.2d 869, 871 (5th Cir. 1981) *citing Lewis v. S.S. Baune*, 534 F.2d at 1124.

11

**Guidry's Non-Competition Clause**

The Louisiana statute governing non-competition provisions provides that  "[e]very [such] contract or agreement, or provision thereof . . . except as provided in this Section, shall be null and void." La. R.S. 23:921(A).  The statute further sets forth the exceptions to this provision, defining the limited circumstances under which a non-competition clause may be valid and enforceable against a former employee, providing in pertinent part as follows: "Any . . . employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer *within a specified parish or parishes, municipality or municipalities, or parts thereof*, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment." La. R.S. 23:921(C) (emphasis added).  Because non-competition clauses "are in derogation of the common right, they must be strictly construed against the party seeking their enforcement."  *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So.2d 294, 298 (La. 2001).

Judge Drell of this Court has recently considered a non-competition clause which, like the instant clause, failed to specifically list the parishes to which it applied.  He held that the clause was therefore unenforceable under Louisiana law.  *Ferrellgas , L.P. v. McConathy*, 2010 WL 1010831 (W.D. La. 3/15/10).  In making this determination, Judge Drell noted that "Louisiana public policy has strongly and consistently disfavored agreements restraining trade, such as non-competition and non-solicitation agreements."  *Id*. at *3 *citing SWAT 24*

12

*Shreveport Bossier, Inc. v. Bond*, 808 So.2d 294, 298 (La. 2001) (noting "the longstanding public policy of Louisiana . . . to prohibit or severely restrict [non-competition] agreements") and *Millet v. Crump*, 687 So.2d 132, 135 (La. App. 5th Cir. 1996) ("Louisiana has a strong public policy against non-competition agreements."). Thus, valid non-competition clauses are the exception, rather than the rule; the exception to the rule is provided for within the statute, to wit, that, in general, the non-competition clause be "strictly limited to designated parishes and contain a maximum term of two years." *Id. citing* La. R.S. 23:921(C).

Judge Drell noted that the proper interpretation of the "geographical limitation" requirement in the statute has generated a longstanding controversy among Louisiana courts, which the Louisiana Supreme Court has not yet resolved. *Id.* at 3-4. After thoroughly reviewing the Louisiana appellate court decisions, Judge Drell determined that "the bulk of Louisiana courts agree, that a non-competition agreement must identify by name the parishes or municipalities to which it applies." *Id.* at *4 *citing L & B Transport, LLC v. Beech*, 568 F.Supp.2d 689, 693 (M.D. La. 2008) ("Because Section 921 speaks to non-competition within a specified parish or parishes, municipality or municipalities, or parts thereof, Louisiana courts have stated that non-competition agreements failing to specify the parish, municipality or parts thereof are unenforceable.") (internal quotation omitted).

Judge Drell noted that the majority of Louisiana courts have held that even a general reference in the agreement to those parishes in which the company conducted business or mere reference to the parishes to which the agreement applies, without listing the parish *by name*,

13

does not comply with the requirements of the statute.  *Id.* (emphasis added) *citing Bell*, 983 So.2d at 933 (chronicling Louisiana cases in agreement), *Action Revenue Recovery, L.L.C. v. eBusiness Group, L.L.C.*, 17 So.3d 999, 1003 (La. App. 2d Cir. 2009) (rejecting a non-competition clause which applied "to all parishes or counties ARR/FAC covers on a like business in said parishes or counties"), *Aon Risk Servs., Inc. v. Ryan*, 807 So.2d 1058, 1060-61 (La. App. 2d Cir. 2002) (invalidating a non-competition clause which covered ' "whatever parishes, counties and municipalities the Company or Hall'. . . conducted business").

Judge Drell rejected the contrary position of the Louisiana Third Circuit Court of Appeals which has held that "the failure to identify each parish by name does not automatically nullify the agreement so long as the parishes covered by the provision are 'identifiable.'" *Id. citing Monumental Life Ins. Co. v. Landry*, 846 So.2d 798, 801 (La. App. 3d Cir. 2003) and *Petroleum Helicopters. Inc. v. Untereker*, 731 So.2d 965, 968 (La. App. 3rd Cir. 1999).

Because the Louisiana Supreme Court has not definitively resolved this issue, Judge Drell properly noted that "it is the duty of the federal court to determine, as best it can, what the highest court of the state would decide, while not being bound by state appellate court decisions, but, at the same time,  not disregarding them "unless [the federal court is] convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.  citing Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 252 (5th Cir. 2002) *quoting Transcon, Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992).

Applying this standard, Judge Drell found "no reason to conclude that the Louisiana Supreme Court would deviate from the approach articulated by the majority of the state appellate courts." Judge Drell recognized the directive of the Louisiana Supreme Court that non-competition clauses be strictly construed against the party seeking their enforcement, taking into account the strong public policy component involved, and that Louisiana courts have generally required "mechanical adherence to the requirements listed in the law (especially the geographical and time limitations)." *Id. citing Swat* 24, 808 So.2d at 298 and *Sentilles Optical Servs., Div. of Senasco, Inc. v. Phillips*, 651 So.2d 395, 399 (La. App. 2d Cir. 1995).

Judge Drell further noted, in support of his holding, that under the rules of statutory interpretation "in order to give effect to the word 'specified' in the statute, courts must require that parishes be designated, rather than enforce general phraseology which would allow the geographical scope of non-competition agreements to be expanded and contracted *ad infinitum*." *Id. citing Aon Risk Servs.*, 807 So.2d at 1060-61.

The undersigned finds Judge Drell's well reasoned opinion highly persuasive. It is clear in this case that Guidry's non-competition clause contains no geographical boundaries whatsoever. Not only does the clause fail to specifically list the parishes that it covers, it also fails to reference or list any other data from which its geographical scope could be determined. Therefore, the undersigned finds that the non-competition clause does not conform to the requirements of La. R.S. 23:921(C), as interpreted by the majority of Louisiana appellate courts. The undersigned finds that the Louisiana Supreme Court would agree. Accordingly,

15

the non-compete agreement signed by Guidry, is invalid and unenforceable.

Even if the Third Circuit's interpretation of the statute were correct, the undersigned finds that the non-competition clause in this case does not make the parishes which it covers sufficiently "identifiable" so as to make the clause enforceable, even under the more forgiving standards accepted by the Third Circuit.

Initially, the court notes that the clause itself fails to mention any Louisiana parishes at all.  Even if one were to overlook this glaring deficiency, the testimony failed to delineate the parishes which compromise the territory of the Lafayette branch where Guidry worked.  To the contrary, Guidry testified that, although he knew he was being hired for the Lafayette branch at the time he signed the JCI Employment Agreement, he was not told, nor was he aware of, the geographical territory in which he would be soliciting or serving customers; he was given no instruction on the geographical territory of the Lafayette branch until several months thereafter. Even then, the geographic territory of the Lafayette branch was not clearly defined; the western boundary fluctuated (initially ending at Crowley and thereafter ending in Jennings) and the northern boundary was non-existent as both the Lafayette and Shreveport branches solicited and competed for customers in the Alexandria area.

The testimony of Larry Heyer, the service manager overseeing the Lafayette branch, corroborates Guidry's testimony.  Although he submitted an affidavit in support of the instant Motion listing the parishes covered by the Lafayette branch, Heyer was unable to name those parishes while testifying in court.  Moreover, Heyer admitted that he could not state whether

Lafayette branch employees were aware of the Lafayette branch geographical territory.

JCI argues that the scope of the non-compete clause may be identified by the location of JCI potential and existing customers Guidry serviced or solicited.  However, Guidry's uncontested testimony was that potential customers were any commercial facility in the market. The lack of a defined territory constituting Guidry's "market" makes the geographical boundaries of the non-compete clause far from "identifiable."

Moreover, at the time he executed the Employment Agreement, Guidry could not determine the limits of the non-competition clause or the extent of the territorial limitations which would be placed on him after his employment with JCI ended.  Guidry was aware only that he was being hired for the Lafayette branch, which covered some undefined geographic area; he was not aware of the identity or geographic location of the existing customers who would be assigned to him, and he was not aware of  the geographical location of potential customers whose business he could solicit.  This uncertainty renders the geographical boundaries of the non-compete clause not "identifiable,"

As such, the non-compete clause is invalid and unenforceable even under the more lenient Third Circuit standard.  *See Medivision Inc. v. Germer*, 617 So.2d 69, 72-73 (La. App. 4th Cir. 1993) (rejecting an argument that "the Greater New Orleans Area" was sufficiently certain to apprise the employee of the territorial scope of the agreement at the time of execution); *Garcia v. Banfield Pet Hospital, Inc.,* - - So.3d - - , 2010 WL 199263 (La. App. 1st Cir. 2010) (invalidating a non-compete agreement, in part, because the "employee could not

determine at the time of execution the limits of the prohibition . . . and had no way to properly

determine the limits of the non-competition agreement at the time the agreement was

confected.); *Bell v. Rimkus Consulting Group, Inc.*, 983 So.2d 927, (La. App. 5th Cir. 2008)

(rejecting an argument that the employees possessed sufficient information to determine which

areas were prohibited by the non-competition agreement because the statute does not

contemplate such an action on the employees part, but rather requires specified parishes "for

the employee to know and understand the limitations upon the signing of the agreement.");

*Aon Risk Servs., Inc.*, 807 So.2d at 1062 (noting the court's belief that "the legislature intended

that the employee know on the front end what his potential restrictions might be and exactly

what price he was being called upon to pay in exchange for employment."); *see also L&B

Transport, Inc. v. Beech*, 568 F.Supp.2d 689, 697-698 (M.D. La. 2008) (finding an agreement

prohibiting solicitation of "any customer of [the former employer] in Alabama" overly broad,

ambiguous and unenforceable as a matter of law).

  In sum, the geographical limitations of the non-competition clause in Guidry's JCI

Employment Agreement are not specified as required by controlling Louisiana law, but, rather,

are amorphous at best.  Given the complete lack of specific parishes to which the clause

applies, the strong public policy disfavoring restraints on competition, and the mandate that

Louisiana courts strictly construe non-competition agreements against the employer, the

undersigned finds that under the particular facts presented in this case, the non-competition

clause in Guidry's JCI Employment Agreement does not conform to the mandates of La. R.S.

23:921(C) or governing Louisiana law and, hence, is unenforceable.[4] [5]

**Guidry's Employee Tampering Clause**

While the non-competition clause is unenforceable under La. R.S. 23:921, the employee tampering clause does not fall within the prohibition of the section. *Emergency Physicians Ass'n v. Our Lady of the Lake*, 635 So.2d 1148, 1150 (La. App. 1st Cir. 1994), *vacated in part on other grounds*, 642 So.2d 179 (La. 1994) *citing John Jay Esthetic Salon, Inc. v. Woods*, 377 So.2d 1363, 1366 (La. App. 4th Cir.1979) ("We hold that the agreement not to solicit the employees of the employer or to engage in a business relationship with them is not within the prohibition of R.S. 23:921."). However, JCI must nevertheless satisfy all four elements set out in *Canal Authority* for the issuance of a preliminary injunction. *Enterprise Intern., Inc.,* 762 F.2d at 472. This, JCI has not done.

While the evidence before the court indicates that Guidry met with Albarado regarding her employment with Air Plus and hence "solicit[ed]" her employment with Air Plus, there is insufficient evidence to support a finding that Guidry "solicit[ed], induce[d] or recommend[ed]" any of the five technicians who are currently employed by Air Plus to leave

---

[4]Louisiana courts make no distinction between non-compete and customer non-solicitation clauses; both must comply with the mandates of La. R.S. 23:921(C). *See Vartech Systems, Inc. v. Hayden*, 951 So.2d 247, 260-261 (La. App. 1st Cir. 2006); *Millet v. Crump*, 687 So.2d 132, 135 (La. App. 5th Cir. 1996) *citing Maestri v. Destrehan Veterinary Hosp., Inc*. 554 So.2d 805, 810 (La. App. 5 Cir.1989), *appeal after remand*, 94-1030 (La. App. 5th Cir. 3/28/95) 653 So.2d 1241, *writ denied*, 95-1534 (La.9/29/95) 660 So.2d 879; *Swat* 24, 808 So.2d at 19 (applying 921(C) to a customer solicitation clause). Accordingly, to the extent that the clause at issue in this case may be construed as a customer non-solicitation clause, for these same reasons, the clause is invalid.

[5]Moreover, the undersigned declines any suggestion by JCI to reform the Employment Agreement to bring it into conformity with La. R.S. 23:921(C). The Agreement contains no severability or savings clause, but rather contains a clause mandating that the Agreement "not be modified or terminated in whole or in part, except by an instrument in writing signed by an officer or other authorized executive of Johnson Controls."

their employment with JCI.

Guidry candidly admitted that he "dealt directly with . . . Michelle [Albarado]".  This testimony is corroborated by that of Albarado, who testified that she met with both Richard and Guidry in Richard's office, at which time "they", Richard and Guidry, asked if she would be interested in working for them.  She further testified that she had contact with both Guidry and Richard with regard to her employment by Air Plus.

With respect to the five technicians, however, the evidence does not establish that Guidry "solicit[ed], induce[d] or recommend[ed]" any of these employees go to work for Air Plus.  To the contrary, Richard's testimony established that he was the contact person who handled the interviews, negotiations and ultimate hiring of these five technicians.  The court finds this testimony credible, given that he, Richard, had previously worked with these technicians, and hence, had a personal relationship with them, unlike Guidry, who had never been a technician, but rather was hired by JCI solely for sales.

Moreover, the undersigned cannot accept JCI's argument that Guidry breached the employee tampering clause on the basis that Air Plus is the "ultimate beneficiary" and that Guidry, as an owner, "cannot accomplish through Air Plus and Richard that which he cannot do directly."  JCI cites no jurisprudence in support of its "indirect" breach theory, nor is the undersigned aware of any such authority.  Additionally, the argument is contrary to the express terms of the Employment Agreement which  prohibits Guidry from engaging in specified activities, but does not, by its terms, apply to Richard or Air Plus. The rules of contractual

20

interpretation do not permit this court to rewrite the clear and unambiguous terms of the agreement in the fashion suggested by JCI.

Guidry's sole connection with the employment of the technicians was in crafting an employee benefit package.  However, Guidry did not rely on any confidential information he obtained from his employment with JCI to craft the benefit packages; to the contrary, Guidry testified that he relied on his own resources, including his prior work experience and contacts which he had established before his employment with JCI.  Additionally, there is no evidence that Guidry supervised any of the five technicians.  Thus, there is insufficient evidence that Guidry engaged in any of the contractually prohibited activities to support a finding that Guidry breached the employee tampering clause of his Employment Agreement.

Although the court has found that Guidry "solicit[ed]" Albarado's employment with Air Plus, a preliminary injunction cannot be issued on the basis of this claimed contractual breach. There is no evidence that Guidry supervised Albarado, who worked on the "project side" of the company, nor is there sufficient evidence that Guidry received or possessed any confidential information about Albarado.[6]  Thus, on the evidence presently before this court, it does not appear that Guidry has breached the terms of his contractual agreement, which prohibits Guidry from soliciting those JCI employees which he supervised.

---

[6]To the extent that JCI suggests that Guidry breached the employee tampering clause by meeting with Richard about the formation of Air Plus, for these same reasons, that argument is unavailing. Guidry did not supervise Richard and there is insufficient evidence that Guidry received or possessed any confidential information about Richard.

21

Finally, even if Guidry breached the employee tampering clause of his Employment Agreement, JCI has not established that special circumstances in this case would make money damages inadequate should JCI prevail on the merits.  *See DFW Metro, Deerfield Med. Ctr., Allied Marketing Group, Inc., supra*. Despite her title of "project coordinator", Albarado's duties demonstrate that she was, in essence, employed by JCI as a billing clerk.  The evidence does not establish that Albarado possessed any special knowledge or skills which made her invaluable to JCI.  As such, JCI may be adequately compensated for the loss of Albarado's services by an award of monetary damages, which may be easily calculated at trial on the merits. *See Baker Petrolite Corp. v. Spicer*, 2006 WL 1751786, *5 (S.D. Tex. 2006) (denying a preliminary injunction with respect to a non-recruitment agreement because the lack of evidence to demonstrate that the recruited employee had specialized knowledge making his loss irreparable and a remedy at law inadequate).

**Guidry's Confidentiality Clause and Guidry and Richard's Confidentiality Agreements**

The same is true with respect to the claimed breaches of Guidry's confidentiality clause and the Confidentiality Agreements signed by both Guidry and Richard. JCI has not established that special circumstances in this case would make money damages inadequate for any proven breach of the confidentiality clauses or agreements.

An agreement not to use confidential information is enforceable if the information used is, in fact, confidential.  *NCH Corp. v. Broyles*, 749 F.2d 247, 253 (5th Cir. 1985). Moreover, while Guidry's non-competition clause is unenforceable under La. R.S. 23:921, an agreement

not to disclose confidential information may be enforceable. *Millet v. Crump*, 687 So.2d 132, 135 (La. App. 5th Cir. 1996). Finally, "[e]ven in the absence of a contract not to disclose confidential information, an agent has a duty not to use or communicate information given to him in confidence in competition with or to the injury of the principal . . . ." *NCH Corp.*, 749 F.2d at 253. This rule applies to information which is stated to be confidential, information which the agent should know his principal would not care to have revealed to others or used in competition with him, and "to unique business methods of the employer, trade secrets, lists of names and all other matters which are peculiarly known in the employer's business." *Id.*

JCI argues that both Guidry and Richard used confidential or proprietary information in connection with their obtaining the Iberia Parish School Board work, and in connection with the hiring of the five former JCI technicians. Accordingly, each of these contentions is discussed below.

**Loss of the Iberia Parish School Board Contract**

JCI apparently contends that the JCI pricing (rate) information for the Iberia Parish School Board ("the Board") is confidential or proprietary information which was disclosed or used by Richard and Guidry to enable them to obtain the Board's business. The parties dispute whether the pricing (rate) information is confidential or proprietary. However, the court need not determine whether the pricing (rate) information is confidential or proprietary for proper resolution of the instant Motion, because even assuming that the information is confidential or proprietary, JCI is not entitled to injunctive relief.

23

It is clear that both Guidry and Richard knew the JCI service rate for the Board, because both attended the meeting wherein the new rate proposal for the Board was determined. However, the court notes that there has been no direct evidence that either Richard or Guidry disclosed, or used, this pricing (rate) information, to obtain the Board's work.  To the contrary, both denied that this was the case (not only with the Board but with all former JCI customers) and their testimony is corroborated by that of Lopez, who, by affidavit, testified that neither Guidry nor Richard disclosed JCI pricing or other confidential information to him.  Of course, since both Richard and Guidry knew the pricing information, they could adjust the Air Plus pricing to favorably compete for the Board's business.  However, JCI has failed to demonstrate that its injury as a result of this alleged breach could not be adequately compensated by monetary damages.

Where economic rights are involved,  irreparable harm exists "when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative." *Allied Mktg. Group, Inc*., 878 F.2d at 810; *Block Corporation v. Nunez*, 2008 WL 1884012, *6 (N.D. Miss. 2008).  While a loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable (*see Allied Mktg. Group,* affirming the district court's holding that damage to goodwill was irreparable because it might be "incapable of calculation"), in its pleadings in this Court and by affidavit of John Lawrence Heyer, JCI has specifically alleged the exact amount of profits it lost as a result of the cancellation of the Iberia Parish School

Board contract.  Thus, these damages are not incalculable or speculative.

JCI also suggests that there is a possibility of negative goodwill.  However, simply arguing that a company is losing customers and goodwill without showing that monetary damages are inadequate is insufficient to establish irreparable harm as required for injunctive relief.  *See Millennium Restuarants Group* and *Sun Water Systems, Inc., supra*.

Thus, based on the record before this court, the court finds that JCI has not successfully shown that money damages are insufficient compensation for any harm it has sustained, or that money damages are "especially difficult" to calculate.  Accordingly, JCI's damage, if any, does not rise to the irreparable harm level necessary for the extraordinary relief of a preliminary injunction.  *See Block, Corp., supra*.

While not strenuously argued by JCI herein, the same is true with respect to other former JCI customers with whom Guidry and Richard have had contact on behalf of Air Plus.  There is simply insufficient evidence for this court to find that monetary damages would not adequately compensate JCI for any alleged injury which JCI claims to have suffered.  This is particularly true with respect to the alleged cancellation of contracts by Tolson Management Company and the Acadia Parish Police Jury.  Like the contract cancelled by the Board, to the extent that JCI prevails on the merits of its claim, the loss of profits claimed by JCI can be easily calculated.  The same is true with respect to any profits JCI claims, and proves, to have lost as a result of confidential or proprietary information allegedly used or disclosed by Richard or Guidry.

**Hiring of Former JCI Technicians**

JCI also contends that Guidry and Richard used confidential or proprietary information in connection with the hiring of the five former JCI technicians.  Although unclear, it appears that JCI contends that its former technicians' salaries and skill sets are confidential or proprietary information which were used by Richard and Guidry to enable them to hire these technicians for Air Plus, in contravention of the contracts signed by them and their legal duty not to use confidential information in competition with their former employer.

Whether information regarding the technicians' salaries and skill sets are encompassed by the definition of "Intellectual Property" contained in the Employee and Intellectual Property and Confidentiality Agreements signed by Richard and Guidry, and whether such information is confidential or proprietary within the meaning of these Agreements and Guidry's Employment Agreement is disputed by the parties.  However, again, for resolution of the instant Motion, the court need not resolve this dispute.

The court notes that JCI has provided this court with no authority that expressly holds that knowledge of an employee's salary or skills is confidential or proprietary information.  The evidence, however, suggests just the opposite.  Initially, the court notes that there is no evidence suggesting that either Guidry or Richard had knowledge of the benefit package provided by JCI to any of the technicians; in fact, each denied having any such knowledge.  It is undisputed that the former JCI technicians were union employees, while both Guidry and Richard were not.  Thus, the technicians' benefits differed from the benefits package enjoyed

26

by Guidry and Richard.  Hence, the court finds Guidry's and Richard's testimony on this point is credible.

Furthermore, as noted by both Guidry and Richard, because the technicians were union employees, their salary scales could be obtained by anyone utilizing the internet.  As such, in Richard's words, their salaries were "pretty common" or "street knowledge."  While former employees have a duty not to use confidential information in competition with their former employer, that duty does not extend to information which is a matter of general knowledge.  *See NCH Corp.*, 749 F.2d at  254 ("an agent has a duty not to use . . . information given to him in confidence in competition with or to the injury of the principle *unless the information is a matter of general knowledge*.") (emphasis added).

On the other hand, the evidence establishes that both Guidry and Richard had knowledge of the skill sets of the technicians which have been hired by Air Plus.  In particular, each admitted having knowledge that Dennis Guidry had been assigned by JCI to perform work for the Iberia Parish School Board.  Indeed, by email dated October 26, 2010, Guidry advised Lopez that Air Plus would be acquiring "key members of your current service providers team . . . ", which members presumably included Dennis Guidry.

Assuming, without deciding, that this information constitutes "Intellectual Property" or confidential or proprietary information protected under the terms of the Agreements signed by Richard and Guidry, or is prohibited from use in competition under common law principles, JCI has not established that its alleged injury cannot be remedied by an award of damages.  As

27

was the case with the loss of the Iberia Parish School Board contract, in the event JCI prevails on the merits, any loss shown to be associated with the departure of the former JCI technicians may likewise be calculated based on the profits lost from contracts and customers previously serviced by each technician.

Moreover, while JCI apparently contends that the loss of these technicians also negatively impacted its goodwill, there was insufficient evidence presented at the hearing to support that contention.  Furthermore, given the size of JCI, any claim that the loss of air conditioning technicians could affect the company's ability to secure new customers or maintain the customers they currently have is suspect.  This is particularly true given Guidry's uncontradicted testimony that, with respect to the School Board, Lopez expressly said that he would not change service providers based on any employee, but, rather, the change to another service provider would be based on the price for the services.  Guidry explained that rationale, testifying that it would be a mistake for a company to change service providers based on any employee because any such employee could die or quit the newly contracted company.  On the present record, the court finds no basis to disregard that testimony.

Based on the above, JCI has not made the threshold showing necessary for the issuance of a preliminary injunction in this case for any claimed breach of the confidentiality clauses or agreements; JCI has not established that special circumstances in this case would make money damages inadequate.

**Customer Lists/LUTSA Claim**

Broadly, the LUTSA proscribes the misappropriation of information that constitutes "trade secrets." *See* La. R.S. 51:1431. A plaintiff may obtain injunctive relief for either "[a]ctual or threatened misappropriation." La. R.S. 51:1432.[7]  However, an injunction may be issued "only upon a showing of irreparable loss or injury without an adequate remedy at law." *Tubular Threading, Inc. v. Scandaliato*, 443 So.2d 712, 715 (La. App. 5th Cir. 1983).  The applicant "must also show that the threat is immediate and that there is a clear and present need for it."  *Id.*

"In order to show that the trade secrets have been misappropriated, [the employer] would have to prove that (1) a trade secret existed, and (2) that they were misappropriated by the [employee]." *Ferrellgas,* 2010 WL 1010831, at *7 *citing Advance Prods. & Svs., Inc. v. Simon*, 944 So.2d 788, 793 (La. App. 3rd Cir. 2006).

The term "misappropriation" is defined as "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  La. R.S. 51:1431(2).

The LUTSA provides a specific definition of the term "trade secret": "'Trade secret' means information, including a formula, pattern, compilation, program, device, method,

---

[7]The statute also contains provisions allowing claimants to recover damages for actual losses and unjust enrichment. See La. R.S. 51:1433.

technique, or process, that . . . derives independent economic value, actual or potential, from

not being generally known to and not being readily ascertainable by proper means by other

persons who can obtain economic value from its disclosure or use, and . . . is the subject of

efforts that are reasonable under the circumstances to maintain its secrecy."  La. R.S.

51:1431(4).  Determining whether information qualifies as trade secrets is a question of fact.

*Ferrellgas,* 2010 WL 1010831, at *7 citing Corrosion Specialties and Supply, Inc. v. Dicharry*,

631 So.2d 1389, 1391 (La. App. 5th Cir. 1994).

Initially, the court notes that, unlike the case of Richard, there has been no evidence

presented to this court that upon leaving JCI, Guidry took any documents which could be

considered confidential or proprietary.  Moreover, there is no evidence before this court that

Richard provided Guidry with copies of the documents he emailed to his wife on September

10, 2009.  To the contrary, Richard testified that he did not give the documents to anyone, and

Guidry testified that he did not even know these documents were in Richard's possession, as

Richard had never told him anything about them. Indeed, Guidry testified that he had not seen

one of the documents until January 2010, when he sought counsel in connection with the

instant suit; he had not seen the other document until the day of the hearing.

It is, however, undisputed that in conjunction with his resignation, Richard emailed two

JCI customer lists to his wife on September 10, 2009.  JCI therefore argues that the

information contained in the customer lists constituted "trade secrets" which were used by

Richard in violation of the LUTSA, thereby entitling JCI to a preliminary injunction under the

Act.  However, on the record before this court, the grant of a preliminary injunction at this time is not warranted.

"The threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact." *Core v. Martin*, 543 So.2d 619, 621 (La. App. 2nd Cir. 1989).  Louisiana courts have held that "[a] customer list or special pricing list may be a trade secret if efforts are made to maintain its secrecy."  *Ferrellgas,* 2010 WL 1010831 at *7 *citing Pontchartrain Med. Labs. Inc. v. Roche Biomedical Labs., Inc*., 677 So.2d 1086, 1090 (La. App. 1st Cir. 1996)*, Wyatt v. PO2, Inc.,* 651 So.2d 359 (La. App. 2nd Cir. 1995) and *Core*, 543 So.2d at  621.

The court need not determine if the customer lists may constitute "trade secrets" at this time because, even if the lists are trade secrets, there is insufficient evidence that Richard used, or is using, any information contained in the customer lists in violation of the LUTSA, and to the extent that such use may be presumed, there has been an insufficient showing that there is an immediate threat or that there is a clear and present need for the issuance of an injunction.

While JCI has expressed suspicion that Richard may have used confidential information contained in the customer lists to solicit JCI customers, no evidence to corroborate that suggestion has been presented to the Court.  Richard testified, without contradiction, that, not only did he not use any of the information contained on the lists, he also testified that the lists were of no value to him because they lacked detailed information on the scope of work performed for the customer or the type equipment the customer has.  Additionally, approximately half of the customers on the list were no longer JCI customers and no evidence

31

was presented to establish that Air Plus has performed any work for any of the customers on either list, whether they remained JCI customers or not.

Finally, while it is clear that although Richard possessed the lists after his resignation, the undisputed testimony is that Richard no longer possesses any physical customer list. Richard testified, without contradiction, that he has destroyed all copies of the lists and has removed them from his computer system.  Moreover, Richard testified, without contradiction, that he never provided copies of either of the documents to anyone, other than his counsel in this lawsuit.

To the extent that JCI could demonstrate "use" of the information contained on the customer lists for purposes of establishing an "actual misappropriation"or that such use may be presumed, in general, past infractions, in the absence of a continuing violation or the likelihood of a future violation are not redressable through injunctive relief.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109, 118 S.Ct. 1003, 1020, 140 L.Ed.2d 210 (1998) (addressing standing for injunctive relief); *James v. City of Dallas*, 254 F.3d 551, 564-565 (5th Cir. 2001) (same).  Furthermore, under the present circumstances, JCI has not shown, nor can the court find, that there is a "clear and present need" for the issuance of a preliminary injunction.  *See Tubular Threading, Inc.*, 443 So.2d at 715.

At this time, Richard's knowledge of JCI customers and contract information is limited to that which he may remember from his past frequent interactions with JCI customers while in JCI's employ.   However, Richard's memory as to the value and operations of certain

customers does not constitute "trade secrets." *Ferrellgas,* 2010 WL 1010831 at *8 *citing*

*Millet*, 687 So.2d at 136 (holding that information that an insurance agent "could recall . . .

about renewals on some of her former clients because of the long-term relationship with them

through her business as well as socially" did not constitute trade secrets); *see also L & B*

*Transport, LLC v. Busby*, 2008 WL 4845103, at *5 (M.D. La. 2008) *citing Weighing &*

*Control Servs., Inc. v. Bert Williams*,1989 WL 6011 (E.D. La. 1989) ("a former employee is

allowed to rely on his memory and on the general information he acquired while working for

his former employer in soliciting customers . . . mental knowledge, from years of employment

 . . . of the names and addresses of the plaintiff's customers are not trade secrets . . . . ").

Considering all of these circumstances, the issuance of a preliminary injunction in this

case under the LUTSA is not warranted. The evidence does not reflect that Richard or Guidry

are currently in possession of any information beyond the identities, and perhaps the general

operations, of certain JCI customers.  Their knowledge and skill was acquired through

experience and, at the present time, has been retained only in their memory.  There is

insufficient evidence before the Court to indicate that Richard or Guidry used any of this

information to solicit JCI customers, and to extent that such use may be presumed, there has

been an insufficient showing that there is an immediate threat or that there is a clear and

present need for the issuance of an injunction. Therefore, JCI's motion for preliminary

injunction will be denied as to JCI's LUTSA claim.

**Claim against Air Plus**

JCI requests that this court require Air Plus to disgorge any profits it has made by allegedly improperly using JCI's trade secrets and confidential information.  While this court may ultimately exercise its equitable powers to order such relief,[8] in the context of the instant Motion for preliminary injunctive relief, the court declines to do so.  The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 627 (5th Cir. 1985). Under the circumstances of this case, this purpose will not be served by granting JCI the requested relief at this time.  If proper to do so, the Court can grant that relief after trial on the merits.

Moreover, given the above analysis, and further given that JCI has alleged a specific sum ($210,000.00) which it claims represents the profits JCI lost when the Iberia Parish School Board cancelled its contract to purportedly award the contract to Air Plus, it appears that an award of monetary damages can adequately compensate JCI for the harm alleged herein and that such damages may be easily computed.  Thus, JCI has not made the threshold showing necessary for the issuance of a preliminary injunction against Air Plus.

---

[8] *See S.E.C. v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) (noting that ordering disgorgement of profits is within the court's equitable powers).

For the above reasons, the Motion for Preliminary Injunction filed by plaintiff, Johnson Controls, Inc. [rec. doc. 2] is **DENIED.**

Signed this 9th day of July, 2010, at Lafayette, Louisiana.


_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE